UNITED STATES of America,
Plaintiff–Appellee,

v.

Miguel Arnaldo DELGADO, Deepak
Kumar, Defendants–Appellants.

No. 01–15299.

United States Court of Appeals,
Eleventh Circuit.

Feb. 20, 2003.

Philip Louis Reizenstein, Philip L. Reizenstein, P.A., Marcia J. Silvers, Miami, FL, for Defendants–Appellants.

Harriet R. Galvin, Anne R. Schultz, Stephen Schlessinger, Miami, FL, for Plaintiff–Appellee.

Before WILSON and FAY, Circuit Judges, and MILLS *, District Judge.

RICHARD MILLS, District Judge:

On April 11, 2001, a jury convicted Appellants Deepak Kumar and Miguel Delgado of engaging in an "alcohol diversion" scheme whose purpose was to evade federal liquor taxes.

The Appellants timely appealed.

## I. FACTS

### A. Synopsis of Scheme

In brief, the Government's evidence showed that Kumar ordered 15 shipments of liquor in Missouri and directed it to be sent to Delgado's bonded warehouse in Miami. Delgado then shipped the liquor to Honduras, but it only remained there until he could bring it back to his Miami warehouse. Once the liquor arrived in Miami, Delgado prepared paperwork indicating that it was re-exported to South America. In most instances, a shipping company owned by Jose Bermudez[1] was the designated shipper. Bermudez, however, did not ship the liquor to South America. Instead, his non-bonded trucking company delivered the liquor to transport companies owned by unindicted coconspirator William Coleman. Coleman's companies transported the alcohol by rail to Buffalo, N.Y. in exchange for cash payments of $2,000 he received from an unknown party. When the liquor arrived in Buffalo, Kumar sold it to Fabian Hart for between $75,000.00 and $85,000.00 per shipment. The payments Hart made to Kumar were cash transactions.

The jury convicted Kumar on all 29 counts of the indictment and it convicted Delgado of 28 counts. The Court sentenced Kumar to six months incarceration for each charge he was convicted of and ordered his sentences to run concurrently. The Court likewise sentenced Delgado. The District Court determined the amount of loss to the United States in unpaid liquor taxes to be $681,519.15. Thus, it ordered Kumar and Delgado to pay restitution in this amount.

### B. Evidence Presented at Trial

The Government used numerous witnesses to detail the alcohol diversion scheme. Jerry Bowerman, the Bureau of Alcohol, Tobacco, and Firearms' ("ATF") chief of alcohol and tobacco diversion, testified as an expert in the area of alcohol diversion. Agent Bowerman explained that taxes are due on liquor once a distillery produces it. But if the liquor is going to be exported and it is secured in a bonded warehouse or transported "in bond," no taxes are assessed until the liquor is removed from its bonded status and enters the United States' stream of commerce. Once this happens, taxes must be paid. According to Agent Bowerman, a liquor smuggler's typical load consists of 1,700 cases of 1.75 liter bottles. The load consists of about 850 1.75 liter bottles of Canadian whiskey, and equal amounts of vodka and rum. By illegally diverting a load such as this, smugglers avoid paying about $52,424.55 in taxes.

During an 18 month period beginning on October 30, 1995, Kumar placed 15 orders with a Missouri liquor producer, McCormick's Distillery, Inc. ("McCormick's Distillery"). Each order consisted of 900 cases of Canadian whiskey, 450 cases of vodka, and 400 cases of rum. The orders were supposed to be exported to Inver-

---

* Honorable Richard Mills, United States District Judge of the Central District of Illinois, sitting by designation.

1. Bermudez was also convicted, but he is not a party to this appeal.

siones Sula, S.A. de CV ("Sula"), Mr. Kumar's client in Honduras. The exporter named on the bills of lading was "McCormick Distilling Company, Inc., on behalf of Isle Trading Company, Inc. ('Isle Trading')"—a company owned by Kumar.

McCormick Distillery's Customer Service Supervisor, Eula Jean Hunt, testified that she filed ATF Form 5100.11 and prepared bills of lading to show that all Multinational's orders were exported. Schenker International's Ocean Export Manager, Michael Long, then arranged to have Kumar's orders exported. Upon reviewing the draft invoice McCormick Distillery prepared for the first of these shipments, Long advised Kumar that there might be a problem because it showed that the liquor was "sold" to Multinational in Miami and "ship[ped] to" Multinational in Miami. Kumar told Long that the shipper of the liquor was Isle Trading in Nassau, Bahamas, not Multinational in Miami. Kumar also said that the shipment was consigned to Sula and that Miguel Delgado, Sula's gerente (the Spanish word for General Manager), was the contact person. Based on this information, McCormick Distillery prepared final invoices stating that the liquor was sold to Isle Trading and that it was shipped to Sula in Honduras. Long put this same information on the bills of lading.

On August 5, 1996, Kumar told Long to change the consignee from Sula to "H.C.S. (Zona Libre)" in Honduras, but to keep Delgado as the contact person. Shipments 5 through 10 were shipped according to Kumar's August 5 instructions. When it came to make shipment number 11 in March of 1997, Kumar told Long to change

the consignee back to Sula, but to once again list Delgado as the contact person. Kumar also told Long that all future shipments to Honduras were to be consigned to Sula unless otherwise noted. The bills of lading for shipments 11 through 15 were changed to reflect Kumar's directive.[2]

In late April or early May 1997, the ATF began investigating Kumar. An ATF inspector named Schieferdecker met with Kumar, Delgado, and Bermudez. During the meeting, Kumar acknowledged that he owned Isle Trading and Multinational. Delgado said that he was president of Lancer International Corporation in Miami and of Lancer International de Honduras. Bermudez said that he was the president of TransOcean Carrier in Venezuela and Miami, a shipping line, and OceanTransport, a trucking company that operated out of the same office as TransOcean.

The Government acquired documents from the truckers and shippers who transported Kumar's 15 liquor shipments. These documents showed that Delgado's Lancer International de Honduras contracted with King Ocean Shipping to transport all 15 liquor shipments from Honduras back to the United States. Kumar paid Delgado $3,350.00 to ship the alcohol from Miami to Honduras. He paid Delgado another $1,650.00 to have the liquor shipped from Honduras back to Miami. Thus, by shipping the liquor in such a round-about fashion, Kumar incurred additional expenses of $5,000.00 per load.

The Government called Inspector Schieferdecker to testify early in the Ap-

---

**2.** Whoever possesses the original bill of lading for a shipment has title to the goods and may take possession of them. The original bill of lading for shipment number 1 liquor was sent to Kumar and Delgado. The bill of lading for shipment number 2 was sent to Kumar alone.

The bills of lading for shipments 3–15 were shipped to Delgado. All 15 bills of lading stated: "These commodities are licensed by the United States for ultimate destination HONDURAS. Diversion contrary to U.S. law is prohibited."

pellants' two-week trial. Inspector Schieferdecker, a non-expert, testified that his analysis of thousands of documents "led to only one possible outcome. It pointed to the diversion of alcoholic beverages...." The Appellants objected because Inspector Schieferdecker had not been qualified as an expert and, therefore, could not properly render an opinion about an ultimate issue. They also moved for a mistrial. Judge Middlebrooks sustained the Appellants' objection as unresponsive and because the Government had not sought to qualify Inspector Schieferdecker as an expert. He reserved on the mistrial motion. Thereafter, the Appellants had an opportunity to cross-examine the Inspector and present additional evidence. When Kumar called their expert witness, he too stated that the evidence pointed to an alcohol diversion scheme. Ultimately, Judge Middlebrooks chose to deny the Appellants' mistrial motion and issue a curative instruction.

Based on Inspector Schieferdecker's review of the bills of lading for the 15 shipments, he was able to determine the path each shipment took. The 15 shipments were purchased by Kumar's Isle Trading Company, and shipped to Delgado's care at either Sula or H.C.S. in Honduras. Delgado then "sold" the liquor back to Kumar and re-shipped it to Miami for Kumar. A bonded trucking company transferred the liquor from the ship to Delgado's bonded warehouse. It was kept at Delgado's bonded warehouse and designated for export to Venezuela or Guatemala. Except for one occasion, none of the liquor was actually shipped to either of those countries. If this was a record-keeping error, a still more serious irregularity became apparent when the Government discovered that liquor shipments 1–6 (whose bills of lading had been prepared by Delgado's company) falsely described the shipments as "foodstuffs" even though other shipping and warehouse records reported that the shipments contained 1,700–plus cartons of whiskey, vodka, and rum.

For shipments 7–14, Kumar arranged for Delgado to transport liquor back from Honduras to Miami. A Customs Form 7512 was filed for each of the shipments, accurately identifying the contents as liquor. Nevertheless, Customs agents became suspicious of these shipments because they were brought back to Miami so soon after they were shipped to Honduras. Upon investigation, the Customs Department discovered that shipment number 10's bill of lading was, like shipments 1–6, falsely identified as "foodstuffs."

Unindicted co-conspirator William Coleman testified that he recalled "roughly" fourteen occasions in 1996 and 1997 when Coleary Transport, a transloading company, received containers with cases of liquor, all in plastic bottles, from Lancer. According to Coleman, Coleary broke the seals of the containers it received and put the liquor in new containers with new seals. Coleman shipped these containers to Buffalo, N.Y. by rail on Lancer's order. When the liquor arrived in Buffalo, Coleman called a beeper number with a 305 area code to inform a man named "Jose" that the Lancer shipment had arrived. Coleman also provided "Jose" with a pick-up number so that the railroad company would release the shipment to whoever the shipment had been consigned.

Once the liquor arrived in Buffalo, Kumar had someone contact Fabian Hart. Hart was a business associate of Kumar's to whom Kumar sold McCormick Distilling Company whiskey, vodka, rum, and gin. Hart received 1,500 to 1,700 cases of liquor per shipment at the St. Regis Mohawk Reservation and paid Kumar $75,000 to $85,000 for each delivery.[3] Hart sold the

---

**3.** The reservation is located half in New York and half in Canada. The deliveries occurred

liquor through the business he operated at the reservation. He never paid taxes for any of the liquor and the liquor never had any paperwork with it such as bills of lading or Customs documents.

Hart was charged in a separate indictment with liquor and tobacco smuggling, but he cooperated with the Government in exchange for a reduced sentence. He too testified at the Appellants' trial. During his direct examination, the prosecutor asked: "Mr. Hart, based on the purchase of alcohol from the defendant Deepak Kumar, you, in fact, have, [*sic* ] were arrested and have subsequently been indicted on criminal violations, is that correct sir? . . . And those charges include smuggling alcohol, is that correct?" Hart answered "yes" and the Defendants objected to the questions as leading. At the ensuing sidebar, the prosecutor explained that she asked the question in order to show that Hart had pled guilty to a lesser offense in New York and that he was testifying as part of a cooperation agreement. Defense counsel argued that the questions were "highly prejudicial" and "cast a tremendous aura" over the Defendants. However, the judge ruled that it was entirely proper for the prosecutor to bring out the terms of Hart's plea agreement on direct examination. Hart's plea agreement was subsequently entered into evidence without objection. Kumar's attorney then cross-examined Hart about the indictment, but he did not clarify Kumar's lack of involvement in the New York indictment.

About the only bright spot Kumar enjoyed during the trial was the testimony of Dennis Snyder, a former Regional Counsel for the United States Customs Service. Mr. Snyder testified as an expert witness on Kumar's behalf. Mr. Snyder opined that because Miami is a major trans-shipment point for goods that are destined for

Latin America, it is not unusual for liquor that is shipped to Honduras to be re-shipped to Miami even when the ultimate goal was to ship the goods to countries like Venezuela or Haiti. Mr. Snyder also stated that if a freight-forwarder was hired to ship liquor from Honduras to Venezuela, it would be less costly "to bring the goods back to Miami and then re-ship them to Venezuela." He continued by saying that even though there had been shipping irregularities and the conditions of bond had been breached as to all shipments, Kumar had no tax liability for the liquor he purchased and there was no evidence that Kumar was connected to the illegal deliveries. In Mr. Snyder's opinion, the trucking companies who transported the liquor were liable for duties and taxes. He also explained that Lancer's liability ended, for purposes of Customs obligations, when it turned the liquor over to the bonded carriers. On cross-examination, though, Mr. Snyder admitted that he had not heard the testimony of any witnesses and did not know what Kumar's intentions were with regard to the liquor.

The jury returned guilty verdicts as to both men. Kumar was found guilty of all 29 counts in the indictment. Delgado was convicted of every charge except Count 2, a count alleging substantive violations of 26 U.S.C. § 5601(a)(11).

Kumar and Delgado both filed timely appeals and they contend that the jury did not have sufficient evidence to convict them. On appeal, Kumar argues that the District Court erred when it: (1) denied the mistrial motion relating to Inspector Schieferdecker's testimony; and (2) allowed Fabian Hart to testify about Kumar's involvement in a separate liquor scheme. Delgado makes an error claim of his own, alleging that the District Court

within the New York portion of the reservation.

incorrectly calculated the amount of loss attributable to him.

This Court exercises its jurisdiction to hear Kumar and Delgado's appeals pursuant to 28 U.S.C. § 1291.

## II. ANALYSIS

### A. *Appellants' Sufficiency of the Evidence Claims*

■ The Court of Appeals uses a *de novo* standard of review when it decides whether there is sufficient evidence to support a jury's verdict. *See United States v. Miles*, 290 F.3d 1341, 1355 (11th Cir.2002). Evidence is viewed "in the light most favorable to the government, with all reasonable inferences and credibility choices made in the government's favor." *Id.* A jury's verdict will be affirmed if the Court finds that a "jury was rationally able to find that every element of the charged crimes was established by the government beyond a reasonable doubt." *See United States v. McCarrick*, 294 F.3d 1286, 1289–90 (11th Cir.2002).

■ The jury convicted Kumar and Delgado of several counts of conspiring to avoid payment of liquor taxes. *See* 18 U.S.C. § 371. The essential elements of a conspiracy are an agreement between two or more persons to commit a crime against the United States and an overt act by one of them in furtherance of the agreement. *See United States v. Guerra*, 293 F.3d 1279, 1285 (11th Cir.2002) (citations omit-

ted). The government must prove beyond a reasonable doubt that the defendant knew of the conspiracy and that he voluntarily became a part of it. *Id.* The existence of a conspiracy may be proved by circumstantial evidence and may be inferred from concert of action. *Id.*

### 1. *Kumar's Conviction*

■ Kumar contends that the evidence was insufficient to convict him of conspiring to violate § 5601(a)(11), § 5601(a)(12), or § 5608 because the Government never proved by competent evidence that the liquor taxes had not been paid or that he knowingly entered into an agreement to evade liquor taxes.[4] He also contends that his convictions are legally insufficient because the Government never proved that the liquor he sold to Hart was the same liquor that was unlawfully diverted.

All the jury had to conclude was that he and Delgado agreed to violate tax laws, that he took an act in furtherance of the agreement, and that he entered into the agreement knowingly and voluntarily. *See* 18 U.S.C. § 371. At trial, the Government's evidence showed that McCormick Distillery never paid taxes on the 15 liquor shipments Kumar ordered because Kumar indicated that the shipments would be exported. Although Kumar filed an ATF Form 5100.11 to show that each shipment was designated for export, the liquor was never exported. Kumar simply had Del-

---

4. The elements for the § 5601(a)(11), § 5601(a)(12), or § 5608 offenses are as follows: To establish that the Appellants violated § 5601(a)(11), the Government had to prove that Kumar and Delgado "purchase[d], receive[d], or processe[d] any distilled spirits, knowing or having reasonable grounds to believe that any tax due on such spirits has not been paid or determined as required by law." *Id.* To establish that the Appellants violated § 5601(a)(12), the Government had to prove that Kumar and Delgado "remove[d], other

than as authorized by law, any distilled spirits on which the tax has not been paid or determined, from the place of manufacture or storage, or from any instrument of transportation, or conceals spirits so removed." *Id.* To establish a violation of § 5608, the Government had to show that Kumar and Delgado, with intent to defraud the United States, re-landed and received within the United States distilled spirits which had been shipped for exportation and on which federal excise taxes had not been paid. *Id.*

gado move it from Miami to Honduras and then back to Miami. Once the liquor returned to Miami, Kumar made cash payments to transloading companies Coleary Transport and W.J. Coleman and Associates to ship it to Buffalo, NY. Kumar then sold the liquor to Hart for $75,000.00 to $85,000.00 for each shipment. Hart paid Kumar in cash.

■ The foregoing evidence provides a sufficient basis for convicting Kumar. Kumar, however, ignores this evidence and concentrates on the testimony of Customs Inspector Ward Cox in an effort to fashion a "get out of jail free card" for himself. Inspector Cox testified that the Customs Service—the agency whose duty it is to collect taxes due on all imported goods—had no record of taxes having been paid on any of the 15 shipments. On cross examination, Inspector Cox stated that he was not the official custodian of records at the Customs Revenue Office and admitted that he had not searched the records for tax payments "because entries for exportation had been made." Kumar seizes on these statements in an effort to show that the Government failed to prove by competent evidence that the taxes were not paid.

Contrary to what Kumar argues, the Government does not have to establish non-payment of taxes to prove a conspiracy. The Government simply had to prove that Kumar agreed to violate tax laws, that he took an act in furtherance of the agreement, and that he entered into the agreement knowingly and voluntarily.[5] *Id.* Based on the facts in this case, a rational jury could find beyond a reasonable doubt

that Kumar never intended to export any of the 15 shipments and that he only said that they would be exported so he could avoid paying taxes on them when he finally sold the liquor to Hart and other clients in the United States.

Just as Kumar is wrong when he asserts that the Government had to show non-payment of taxes, he is incorrect when he says that there was insufficient evidence to show that he knew about the alcohol diversion scheme. Although Kumar contends that he merely helped Sula to transport liquor to Miami so that Sula could more easily sell and re-export it, the facts described above would allow any rational jury to find that Kumar orchestrated the alcohol diversion scheme.

Kumar also claims that there was insufficient evidence to prove that the liquor he sold to Hart was the same liquor described in the indictment. The 15 liquor shipments described in the indictment contained 1,750 cases of Canadian whiskey, vodka, and rum. Hart's testimony differed, however, from the allegations in the indictment. Hart testified that the shipments he bought from Kumar contained between 1,500 and 1,700 cases of whiskey, vodka, rum, and gin. Kumar seizes on the differences between the quantities and types of liquor described in the indictment and those testified to by Hart, contending that the jury did not have sufficient evidence to convict him.

Even though there were some differences between Hart's recollection and the indictment, Hart's testimony supported the

---

**5.** Even if this was not so, Inspector Cox provided the evidence that Kumar claims the Government failed to prove. Though Inspector Cox was not Customs' official keeper of records, he competently testified that the Appellants filed Customs Forms 7512 indicating that the liquor would be exported. The liquor, however, was never really exported. It

was temporarily shipped to Honduras and then brought back to Miami. Since there was no record that the tax was paid when the liquor reached Miami or was removed from Delgado's warehouse, the jury could reasonably conclude that Kumar never paid the required taxes.

Government's theory of the case in its most critical respect: Kumar sold him very large quantities of "untaxpaid" liquor. Because Hart did not keep business records, he had to testify from memory about these years-old shipments. His memory did not exactly mimic the indictment in terms of quantities and types of liquor, but this was not required of Hart. All Hart had to do was provide the jury with competent evidence of Kumar's participation in the alcohol diversion scheme. Hart did this, so the jury's verdict must stand.

### 2. Delgado's Conviction

██ Delgado contends that the Government failed to prove that he committed the substantive acts in the indictment or that he was part of the conspiracy. The substantive acts in the indictment alleged that Delgado received and removed liquor for which he had "reasonable grounds to believe" taxes remained due. *See* 26 U.S.C. § 5601(a)(11), § 5601(a)(12), respectively.

According to Delgado, the liquor he received was bonded and no taxes were owed on it while it was in bond. His company, Lancer, even had a validated 7512 Customs form to show that each liquor shipment was transported in bond. Thus, he claims that it was factually impossible for him to have received or removed any untaxpaid liquor.

To prove that Delgado was part of a conspiracy, the Government had to establish beyond a reasonable doubt that he and Kumar agreed to violate tax laws, that he took an act in furtherance of the agreement, and that he entered into the agreement knowingly and voluntarily. *See* 18 U.S.C. § 371. Delgado argues that he did not knowingly participate in Kumar's scheme and that he never profited from it.

Contrary to what Delgado claims, the jury had sufficient evidence to find him guilty of the conspiracy. In short, the

Government proved that Delgado jockeyed Kumar's liquor from port to port, knowingly misidentified shipments as "foodstuffs," filed export forms even though he knew the liquor was never really going to be exported, and held the liquor in his warehouse until it could be diverted into commerce. The evidence also indicated that Delgado profited from his involvement in the alcohol diversion scheme. Although Delgado never received any payment for transporting the liquor beyond his normal fees, he did get Kumar's business for the 15 liquor shipments. Delgado's fee for transporting each of the shipments was between $1455.00 and $2,500.00. This put Delgado's take for the 15 shipments in the $21,825.00 to $37,500.00 range. A rational jury could easily find that this sort of profit provided ample incentive for Delgado's criminal involvement.

Delgado also claims that it was factually impossible for him to commit the crimes with which he was charged. "Factual impossibility occurs when the objective of the defendant is proscribed by the criminal law but a circumstance unknown to the actor prevents him from bringing about that objective." *United States v. Oviedo*, 525 F.2d 881, 883 (Former 5th Cir.1976)(citing *United States v. Conway*, 507 F.2d 1047, 1050 (Former 5th Cir. 1975)). Delgado does not argue that a circumstance was unknown to him, he claims that he never received or removed untaxpaid liquor. Thus, his argument is not a factual impossibility argument. It is a sufficiency of the evidence claim and the Court has already found that claim to be untenable.

### B. Kumar's Motion for Mistrial

██ A trial judge has discretion to grant a mistrial "since he [or she] is in the best position to evaluate the prejudicial effect of a statement or evidence on the

jury." *See United States v. Bender,* 290 F.3d 1279, 1284 (11th Cir.2002) (citation omitted). And when a district court gives a curative instruction, the reviewing court will reverse "only if the evidence 'is so highly prejudicial as to be incurable by the trial court's admonition.'" *See id.* (quoting *United States v. Lozano–Hernandez,* 89 F.3d 785, 789 (11th Cir.1996))(quoting *United States v. Funt,* 896 F.2d 1288, 1295 (11th Cir.1990)).

During the early phase of Kumar and Delgado's two-week trial, Inspector Schieferdecker—a non-expert—testified that his analysis of thousands of documents "led to only one possible outcome. It pointed to the diversion of alcoholic beverages ..." The Appellants objected because Inspector Schieferdecker had not been qualified as an expert and, therefore, could not properly render an opinion about an "ultimate issue." They also moved for a mistrial. Judge Middlebrooks sustained the Appellants' objection as unresponsive and because the Government had not sought to qualify Inspector Schieferdecker as an expert. He reserved on the mistrial motion. Thereafter, the Appellants had an opportunity to cross-examine the Inspector and present additional evidence. When Kumar called Dennis Snyder as an expert witness, even Mr. Snyder testified that the evidence pointed to an alcohol diversion scheme. Ultimately, Judge Middlebrooks chose to deny the Appellants' mistrial motion and, rather, issue a curative instruction per the parties' request.

On appeal, Kumar asserts that he suffered substantial prejudice as a result of Inspector Schieferdecker's comments. He fails to explain why this is so. Even if he had bothered to explain, his argument would be unavailing.

Kumar simply cannot show that he suffered incurable prejudice from Inspector Schieferdecker's remarks when Kumar's own expert witness, Dennis Snyder, testified that he reached the same conclusion that Schieferdecker reached about the existence of an alcohol diversion scheme. Moreover, if there was any prejudice, the court's curative instruction remedied it. *See United States v. Evers,* 569 F.2d 876, 879 (Former 5th Cir.1978)("The voicing of potentially prejudicial remarks by a witness is common, and any prejudice is generally cured efficiently by cautionary instructions from the bench.").

### C. The Evidentiary Ruling on Hart's Testimony

■ This Court reviews a district court's evidentiary rulings for a clear abuse of discretion. *See United States v. Tinoco,* 304 F.3d 1088, 1119 (11th Cir.2002) (citation omitted). A district court's evidentiary rulings will only be reversed if the resulting error "affected the defendant's substantial rights." *Id., citing United States v. Hands,* 184 F.3d 1322, 1329 (11th Cir.1999).

■ Kumar claims that his substantial rights were affected when the Government deliberately solicited false evidence from Fabian Hart. This Court will overturn a conviction resting in part upon the knowing use of false testimony "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *See United States v. Magouirk,* 680 F.2d 108, 109–10 (11th Cir.1982) (quoting *United States v. Agurs,* 427 U.S. 97, 103–04, 96 S.Ct. 2392, 2397–98, 49 L.Ed.2d 342 (1976)). However, "[t]he false testimony must be material before a conviction will be overturned, and materiality must be evaluated in light of all the evidence adduced at trial." *See id.* (citations omitted).

■ According to Kumar, the Government deliberately presented false testimo-

ny when the prosecutor asked: "Mr. Hart, based on the purchase of alcohol from the defendant Deepak Kumar, you, in fact, have, [*sic*] were arrested and have subsequently been indicted on criminal violations, is that correct sir? ... And those charges include smuggling alcohol, is that correct?" Hart answered "yes," and the Defendants objected to the questions as leading. At the ensuing sidebar, the prosecutor explained that she asked the question in order to show that Hart had pled guilty to a lesser offense in New York and that he was testifying as part of a cooperation agreement. Defense counsel argued that the questions were "highly prejudicial" and "cast a tremendous aura" over the Defendants. The judge ruled that it was entirely proper for the prosecutor to bring out the terms of Hart's plea agreement on direct examination. Once the prosecutor completed her direct examination, Hart's plea agreement was entered into evidence without objection. Kumar's attorney then cross-examined Hart about the indictment, but he did not clarify that Kumar was not involved in the New York indictment.

The context of the prosecutor's questions shows that she did not knowingly elicit false information. She merely tried to establish a foundation for the plea agreement so that she could introduce it as evidence. As such, the prosecutor had no duty to "correct" her questions or Hart's response. Moreover, there is nothing in the prosecutor's questions indicating that she was talking about a different liquor scheme. The fact that she was referring to a separate scheme was only apparent during the sidebar. Since the jury did not hear the comments at the sidebar, it could not possibly have known that the prosecutor was questioning Hart about a second scheme. Thus, there is no reasonable likelihood that the false testimony could have affected the jury's judgment or any of

Kumar's substantial rights. *See id.; Hands*, 184 F.3d at 1329.

### D. *Amount of Loss*.

■ Delgado claims that the district court erred when it determined the amount of loss attributable to him. "When a defendant challenges the district court's application of the sentencing guidelines, we review the district court's underlying findings of fact for clear error and application of the guidelines to those facts *de novo*." *See United States v. Maung*, 267 F.3d 1113, 1118 (11th Cir.2001).

■ At sentencing, the District Court determined that the amount of loss Delgado was responsible for was $681,519.15. Delgado claims that the amount of loss should be zero because the Government could have collected on the bond for the liquor shipments, but has not yet chosen to do so.

Under United States Sentencing Guidelines § 2T2.1(a) "the 'tax loss' is the amount of taxes that the taxpayer failed to pay or attempted not to pay." In this case, the evidence showed that the unpaid taxes on the 15 liquor shipments was $681,519.15. Thus, the District Court correctly decided that the amount of loss attributable to Delgado is $681,519.15.

Since the Government has not—to this point—attempted to collect the bond money posted for the 15 liquor shipments, Delgado contends that the doctrine of laches should bar the Government from collecting the bond money and that the amount of loss should be reduced accordingly. Despite Delgado's laches argument, "[i]t is well settled that the United States is not bound by state statutes of limitation or subject to the defense of laches in enforcing its rights." *United States v. Summerlin*, 310 U.S. 414, 416, 60 S.Ct. 1019, 1020, 84 L.Ed. 1283 (1940); *United States*

*v. Fernon,* 640 F.2d 609, 612 (5th Cir. Unit B Mar.1981) (following *Summerlin*). This principle protects public rights vested in the government for the benefit of all from "the inadvertence of the agents upon which the government must necessarily rely." *See Herman v. South Carolina Nat. Bank,* 140 F.3d 1413, 1427 (11th Cir.)(quoting *United States v. Alvarado,* 5 F.3d 1425, 1427 (11th Cir.1993)); *see also United States v. Arrow Transp. Co.,* 658 F.2d 392, 394–95 (5th Cir. Unit B Oct. 1981) (laches "cannot be asserted against the United States in its sovereign capacity to enforce a public right or to protect the public interest").

There have been rare exceptions to this rule in certain civil cases. *See Herman,* 140 F.3d at 1427 (laches bars Equal Employment Opportunities Commission suits because Title VII contains no statute of limitations); *Texaco Puerto Rico, Inc. v. Department of Consumer Affairs,* 60 F.3d 867, 873–74 (1st Cir.1995)(holding that laches was appropriate where Government waited six years to seek wrongly accrued profits). The exception to the general rule has never been applied in a criminal context and there is no good reason to apply it here. Delgado fairly owes restitution and payment of restitution is in the public interest. The doctrine of laches should not be used to prevent the Government from protecting the public interest. *See Arrow Transp.,* 658 F.2d at 394–95.

### III. CONCLUSION

For the reasons stated above, we AFFIRM the Appellants' convictions and the District Court's decision in all respects.