[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 16, 2005
THOMAS K. KAHN
CLERK

No. 04-12842
Non-Argument Calendar
_____

D.C. Docket No. 03-00126-CR-FTM-29DNF

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

MAX CHARLOT,
a.k.a. Demauntri Keithon Dumals,

Defendant-Appellant.

_____

Appeal from the United States District Court for the
Middle District of Florida

_____

(June 16, 2005)

Before TJOFLAT, DUBINA and CARNES, Circuit Judges.

PER CURIAM:

Max Charlot was indicted for conspiracy to possess with intent to distribute

five kilograms or more of cocaine, in violation of 21 U.S.C. § 846, and possession of a firearm during and in relation to a drug trafficking crime, in violation of 18 U.S.C. §§ 924(c)(1)(A) & 2. After a jury trial, he was convicted and sentenced to 262 months imprisonment on the conspiracy charge and 60 months imprisonment on the firearm charge, to be served consecutively.

Charlot challenges his conviction and his sentence on the conspiracy count. He contends that the district court abused its discretion by denying his motion for a mistrial after the government elicited certain testimony from Richard Zayas, an ATF special agent. Charlot believes that the testimony was inadmissible because it was hearsay, because it violated his constitutional right to confront his accusers, and because it was more prejudicial than probative. Charlot also contends that the district court plainly erred in enhancing his conspiracy sentence based on impermissible factfindings, specifically about his role in the offense and the drug quantity involved.

## I.

### A.

At trial, Agent Zayas was the government's first witness. Zayas testified that he participated in an investigation involving Charlot. The investigation started when he and another ATF agent received information from a confidential

informant. The government asked Zayas what type of information he had received from the CI, and Charlot objected on hearsay grounds. The government indicated that it was not trying to elicit what the CI had said, only "generally the subject matter of the information" provided by the CI. Doc. 197 at 15.

During a sidebar conference, Charlot argued that offering a general description of the information received from the CI was just as damaging as offering the specifics of what the CI had told Zayas. The government argued that it was attempting to establish that law enforcement "began an investigation of [Charlot] related to his willingness to participate in home invasion robberies." Id. at 16. After some further discussion, the district court concluded that "it's not hearsay, [it] just explains what the agent did." Id. at 17. The court, however, instructed the government to "elicit that you received information from a CI that led to an investigation and then explain what the investigation was." Id.

The government asked Agent Zayas to identify the nature of the investigation. Zayas responded that "the nature of the investigation was individuals involved in armed home invasion robberies." Id. at 17. Charlot again objected. The government asked Zayas about his intentions regarding the investigation and what he ultimately did. Zayas responded: "[m]y intention was to be introduced to these individuals. At that time determine if these individuals are

3

actually involved in this type of crime, had experience in this type of crime and wanted to commit this type of crime." Id. at 18. Charlot again objected, and the district court called for a sidebar. The court indicated that the government had disregarded its instructions by eliciting that the CI had told Zayas about Charlot's involvement or willingness to participate in home invasions. The government stated that the information described the nature of the offense, but the judge countered that "the nature comes from what the CI said. Any idiot would know what the CI said." Id. at 19.

Charlot moved for a mistrial. He asserted that, because of Agent Zayas' statement, the jury would believe that the CI had told Zayas that Charlot and the others were committing multiple robberies even though they were only charged with one robbery. The judge indicated that he would strike Zayas' testimony and instruct the jury not to consider it. The judge found that a mistrial was unnecessary because, based on Zayas' occupation and the kind of investigation, the information would be somewhat obvious to the jury regardless of what Zayas said. Nevertheless, the judge indicated that he would instruct the jury to disregard Zayas' testimony because of the mention of the "plural" robberies. Charlot reasserted his request for a mistrial and voiced his doubt that the jury instruction would be sufficient. The district court then issued the following instruction to the

4

jury:

> Ladies and gentlemen, the Court will instruct you to disregard, that is to not consider the last couple of answers from the witness with regard to what was told to him by a confidential informant. All you need to know is that he received information and based upon that he started an investigation. You don't need to concern yourself about what was said. That's what we refer to as hearsay and you shall not consider that in any way at this point or during your deliberations.

Id. at 22. The government then proceeded with its examination of Zayas.

Agent Zayas testified that, while undercover, he had met with Charlot and his co-conspirators. Zayas had portrayed himself as a disgruntled drug courier and proposed that the men steal 40 kilograms of cocaine from a stash house. Zayas had told them that someone from the stash house would page him, he would then contact the co-conspirators, and he would have 20 minutes to get to the stash house. Charlot had discussed his plans to execute the robbery and affirmed his commitment to do so.

The government also presented the testimony of government agents who had searched the co-conspirators' cars after their arrests and of four of Charlot's co-conspirators. Each of those four co-conspirators testified that the object of the conspiracy had been to rob the stash house of more than 40 kilograms of cocaine, killing the guards in the process.

At the close of the government's case, Charlot, among other things, renewed

his motion for a mistrial based on Agent Zayas' testimony regarding multiple home invasion robberies because it was both hearsay and prejudicial.  The court denied the motion, stating that "[t]he testimony that came in from Agent Zayas after the objection and without any additional objection was essentially the same and, in any event, there was no manifest necessity in my view for a mistrial."  Doc. 198 at 360.  The court further found that "[t]he instruction I gave was straightforward and severe and told the jury what to do, what not to do with regard to that evidence . . ."  Id.

Charlot rested his case without presenting any witnesses.  He presented his defense through his opening and closing statements and through his questions on cross-examination.  Charlot's defense was that while he participated in the conspiracy, the object of the conspiracy was to rob Agent Zayas, who he thought was a drug courier, of the two kilograms that Zayas was to pick up at the stash house—not to rob the stash house.

The jury found Charlot guilty as charged.  It specially found that Charlot's conspiracy offense involved at least five kilograms of cocaine.  Charlot moved for a new trial based on the district court's denial of his motion for a mistrial.  The district court denied his motion.

**B.**

6

In preparing the presentence investigation report, the probation officer assigned Charlot a base offense level of 34 because the offense involved between 15 and 50 kilograms of cocaine. The probation officer also determined that Charlot was an organizer of the conspiracy and increased his offense level by four. With an adjusted offense level of 38 and a criminal history category of II, the applicable guideline range on the conspiracy count was 262–327 months imprisonment.

The district court adopted the PSI. Charlot requested the court sentence him to the low end of the guideline range, and the government requested a longer sentence. After some discussion, the court sentenced Charlot to 262 months imprisonment as to the conspiracy count and 60 months imprisonment as to the firearm count, to be served consecutively.

## II.

Charlot argues that the district court erred in denying his motion for a mistrial. He contends that Agent Zayas' testimony concerning the information he received from the CI was hearsay that violated his Sixth Amendment right to confront witnesses as explained in Crawford v. Washington, 541 U.S. 36, 124 S. Ct. 1354 (2004). He further contends that a mistrial was warranted because the testimony was inadmissible on the grounds that it was more prejudicial than

7

probative.  At trial, Charlot only argued the hearsay and prejudice points; his

invocation of the recently decided <u>Crawford</u> case to make a Confrontation Clause

argument is new on appeal.[1]

"A trial judge has discretion to grant a mistrial since he or she is in the best

position to evaluate the prejudicial effect of a statement or evidence on the jury."

<u>United States v. Delgado</u>, 321 F.3d 1338, 1346–47 (11th Cir. 2003) (internal

marks and citations omitted).  "[W]hen a district court gives a curative instruction,

the reviewing court will reverse only if the evidence is so highly prejudicial as to

be incurable by the trial court's admonition."  <u>Id.</u> at 1347 (internal marks and

citations omitted).

## A.

Turning first to Charlot's hearsay argument, it is unclear whether the

challenged statements are actually hearsay.  The statements were not offered by

the government to prove that Charlot was actually involved in prior armed home

invasions, but were offered to establish the reason law enforcement initiated its

investigation.  <u>See</u> Fed. R. Evid. 801(c) ("'Hearsay' is a statement, other than one

---

[1] Charlot presents his <u>Crawford</u> argument as if it is encompassed in his hearsay argument. The presentation does not change the fact that a hearsay objection is an evidentiary objection, while  Charlot's <u>Crawford</u> objection arises under the Confrontation Clause of the Constitution. Though we are sensitive to the fact that <u>Crawford</u> had not yet been decided at the time of Charlot's trial, the Confrontation Clause is not new.  Nor is it the same as hearsay law. Accordingly, we treat these as two distinct arguments.

made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.").

Moreover, even if the statements were hearsay, the prejudicial effect of stricken hearsay testimony is slight when it merely summarizes other evidence. United States v. Funt, 896 F.2d 1288, 1296 (11th Cir. 1990). Here, the court denied the mistrial because the same evidence had essentially come in, without objection, through later questioning. Doc. 198 at 360. Thus, the evidence was not "so highly prejudicial as to be incurable by the trial court's admonition." Delgado, 321 F.3d at 1347 (internal marks and citations omitted). The court did not abuse its discretion in refusing to grant a mistrial on hearsay grounds.

**B.**

Charlot's Crawford contention was not raised below. Accordingly, our review is only for plain error. See United States v. Olano, 507 U.S. 725, 731–32, 113 S. Ct. 1770, 1776–77 (1993). "Under plain-error review, the defendant has the burden to show that there is (1) error (2) that is plain and (3) that affect[s] substantial rights. If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." United States v. Monroe, 353 F.3d 1346, 1349 (11th Cir. 2003) (internal marks

and citations omitted; alterations in original).

Here, even assuming there was a Confrontation Clause error that is plain under Crawford, Charlot cannot show that his substantial rights have been affected. Usually, to affect substantial rights an "error must have been prejudicial: It must have affected the outcome of the district court proceedings." Olano, 507 U.S. at 734, 113 S. Ct. at 1778. Charlot's argument that he has been prejudiced derives from his trial defense that he had intended only to rob Agent Zayas of the two kilograms of cocaine that he thought Zayas would be getting from the stash house; he had not intended to rob the stash house of more than 40 kilograms of cocaine and kill the guards, as alleged by the government. Charlot thinks that Zayas' reference to prior "armed home invasion robberies" made it more likely that the jury would conclude that Charlot had intended to rob the stash house.

In light of the overwhelming evidence of guilt introduced at trial, Charlot cannot meet his burden of demonstrating that the challenged testimony affected the outcome of his trial. Charlot admitted that he had participated in the conspiracy, and both Agent Zayas and four co-conspirators testified that the object of the conspiracy had been to rob the stash house. Because Charlot cannot show the existence of plain error under the Supreme Court's Crawford Confrontation Clause case, he cannot show that the district court abused its discretion by refusing

10

to grant a mistrial due to that alleged error.

## C.

Third, we turn to Charlot's argument that a mistrial should have been granted because the challenged testimony was more prejudicial than probative, and thus inadmissable under Fed. R. Evid. 403.[2]  As an initial matter, it is not entirely clear that the statement was inadmissible.  The statement was probative.  It helped to explain why Agent Zayas approached Charlot with the proposition to rob a stash house.  Cf. United States v. Williford, 764 F.2d 1493, 1499 (11th Cir. 1985) ("Evidence, not part of the crime charged but pertaining to the chain of events explaining the context, motive and set-up of the crime, is properly admitted if linked in time and circumstances with the charged crime, or forms an integral and natural part of an account of the crime, or is necessary to complete the story of the crime for the jury.").  Additionally, we have cautioned that "Rule 403 is an extraordinary remedy which the district court should invoke sparingly." United States v. Elkins, 885 F.2d 775, 784 (11th Cir. 1989).  Indeed, "[t]he balance under Rule 403 should be struck in favor of admissibility. " Id.

---

[2] Rule 403 provides that: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

The district court explicitly instructed the jury that they were to disregard the statement. Moreover, Zayas' further testimony, which was admitted without objection, encompassed the same information as the stricken statement. And, in light of Charlot's conceded involvement in the conspiracy and the overwhelming evidence that the object of the conspiracy was to rob the stash house, any potential prejudice from the challenged testimony is not significant. See United States v. Rodriguez-Arevalo, 734 F.2d 612, 615 (11th Cir. 1984) ("Prejudicial testimony will not mandate a mistrial when there is other significant evidence of guilt which reduces the likelihood that the otherwise improper testimony had a substantial impact upon the verdict of the jury."). The district court did not abuse its discretion in denying a mistrial on this ground.

## III.

Charlot contends that his sentence was unconstitutionally enhanced based on judicial factfindings as to his role in the offense and the quantity of cocaine involved. Charlot bases this argument on Blakely v. Washington, 542 U.S. ___, 124 S. Ct. 2531 (2004). After Charlot filed his appeal, the Supreme Court applied its Blakely jurisprudence to the federal sentencing guidelines. See United States v. Booker, 543 U.S. ___, 125 S. Ct. 738 (2005).

Charlot's Booker argument is reviewed only for plain error because he did

12

not raise it before the district court.  See United States v. Olano, 507 U.S. 725, 731–32, 113 S. Ct. 1770, 1776–77 (1993).  A defendant cannot meet the plain error standard for Booker error unless he can demonstrate a "reasonable probability of a different result if the guidelines had been applied in an advisory instead of binding fashion by the sentencing judge."  United States v. Rodriguez, 398 F.3d 1291, 1301 (11th Cir. 2005).

In United States v. Shelton, 400 F.3d 1325 (11th Cir. 2005), the district court indicated that the sentence "was 'very, very severe'" and "noted that 'unfortunately' the Guidelines criminal-history calculation" considered past charges, but not the nature of the crimes as reflected in the sentences imposed.  Id. at 1328.  Additionally, the district court expressed that the sentence was "more than [was] appropriate in this situation."  Id. (alteration in original).  Here, there was nothing approaching that.

In this case, the district court set out the sentencing guidelines range of 262–327 months and asked if Charlot or defense counsel had anything to say before a sentence was imposed.  Defense counsel asked that Charlot be sentenced to the low end of the guidelines range, pointing to Charlot's youth and suggesting that he had fallen in with the wrong crowd.  Charlot himself then apologized to the courts, the government, and his family.  He asked for the low end of the guideline

range and expressed hope that he would eventually be released so that he could set a good example for his son.

The prosecutor responded by emphasizing Charlot's leadership role in the offense and the sentences being imposed on Charlot's co-defendants. The prosecutor also commented that "any sentence in this particular case is obviously a long one and one that's commensurate with the offense." Sentencing Tr. at 8.

Defense counsel then argued again that the low end of the guidelines range would be "sufficient punishment," and that the range was as high as it was because of the role enhancement. Sentencing Tr. at 8–9. The district court confirmed that the role enhancement had contributed to the higher sentencing range, as had Charlot's lack of acceptance of responsibility. The court then said:

> It's hard not to think a sentence of 262 months for anyone isn't a long sentence, certainly, someone with a criminal history of only Category II, so I appreciate what Mr. Cases[, the prosecutor,] is saying about [Charlot's] role [in the conspiracy]. That has been accounted for under the guidelines already. Unless someone talks me out of it, I do intend to impose a sentence at the low end of the guidelines.

Sentencing Tr. at 9. Defense counsel said "I'll be quiet then." Sentencing Tr. at 9. The court responded as follows:


> I don't mean to shut you up, but I want you to know that I think that's a substantial sentence. This is a significant crime and could have resulted in

14

some very serious activity and it didn't. But, nonetheless, the Court feels that 262 months in the circumstances of the case is a sufficient sentence.

Sentencing Tr. at 9–10. The court then sentenced Charlot to 262 months.

Although the district court in this case did note that the sentence was substantial, it also indicated that the lengthy sentence was deserved because of the seriousness of the crime and Charlot's role in committing it. Indeed, the court's comments appear to be an explanation of why the court felt that a longer sentence was not required. Noting that a sentence is "sufficient" is not tantamount to characterizing it as more than sufficient. We do not read the comments as an expression of concern that the sentence was too long. Cf. Shelton, 400 F.3d at 1328.

We recognize that the dialogue between counsel and the court reflects their understanding that the guidelines were mandatory. But, demonstrating plain error under Booker "takes something more than showing the district court sentenced within the Guidelines range and felt bound to do so, especially given that the Guidelines range remains an important factor in sentencing." Id. at 1332 (footnote omitted).

Moreover, defense counsel was not prevented from making any arguments that would have influenced the court to impose a sentence below the applicable

guidelines range. Prior to counsel's comment that he would "be quiet," he had already made all the arguments he intended to make. With respect to the PSI, counsel had asked the court to consider the fact that there were no actual drugs involved and stated that "[t]here's no other legal arguments other than those made" in motions he had previously filed. Sentencing Tr. at 3–4. And, as we've already said, after the court set out the sentencing range, counsel asked that Charlot be sentenced to the low end of the guidelines range, pointing to Charlot's youth and suggesting that he had fallen in with the wrong crowd. When counsel was done with those arguments, Charlot allocuted.

Charlot has not shown a "reasonable probability of a different result if the guidelines had been applied in an advisory instead of binding fashion by the sentencing judge." Rodriguez, 398 F.3d at 1301.

**AFFIRMED.**

TJOFLAT, Circuit Judge, concurring:

Count One of the indictment in this case charged Charlot and five others with conspiring to possess with intent to distribute and to distribute five kilograms or more of a mixture or substance containing a detectable amount of cocaine. The jury's verdict established for Blakely/Booker purposes that the crime involved five or more kilograms of the drug. According to U.S.S.G. § 2D1.1(a)(3), the base offense level for that drug quantity is 32. Given Charlot's criminal history category of II, the sentence prescribed for that offense level was 135 to 168 months' imprisonment. The PSI, however, held Charlot accountable for 40 to 50 kilograms of cocaine, which yielded a base offense level of 34, and adjusted that level by four levels pursuant to U.S.S.G. § 3B1.1(a) for his role as an organizer or leader of the conspiracy. The resulting offense level of 38 enhanced Charlot's sentence range to 262 to 327 months' imprisonment, as the court's opinion indicates, ante at ____, and the court selected the lower figure as Charlot's Count One sentence.

Charlot did not object on Sixth Amendment grounds to the court's enhancement of his offense level from 32 to 38. Hence, a constitutional error did

17

not occur in this case.[1] The only Blakely/Booker error the court could have made was to treat the Sentencing Guidelines as mandatory rather than advisory. Charlot did not object, however, to the district court's treatment of the Guidelines as mandatory. Nor did he raise the issue in his initial (or reply) brief on appeal. Nonetheless, I give him the benefit of the doubt and assume that the Blakely/Booker objection he presents in his briefs subsumes the mandatory/advisory issue. The question thus becomes whether he has shown reversible plain error.

Operating under this assumption, I conclude that Charlot has demonstrated error that is plain. He fails, however, to establish prejudice, the third prong of the plain-error test. As Booker instructs, a district court's starting point in fashioning a post-Booker sentence is to determine the applicable guideline. The court did that in this case, and then imposed a sentence at the bottom of the Guidelines range. Had the court treated that range as advisory, instead of mandatory, we would have to say that the sentence was not unreasonable. Nothing in the record of the sentencing proceeding suggests that the court would have imposed a lesser

---

[1] Charlot's initial and reply briefs assert that the district court committed Sixth Amendment error because it enhanced the defendant's sentence on the basis of facts neither found by the jury nor admitted by the defendant. My reading of the record leads me to conclude that Charlot admitted all of the facts recited in the PSI and thus all of the facts that gave rise to the enhancements.

sentence had it viewed the Guidelines range as advisory. Thus, no prejudice is shown here.