**FOR PUBLICATION**

In the

United States Court of Appeals

For the Eleventh Circuit

————————————

No. 24-10310

————————————

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*versus*

ALBERICO AHIAS CRESPO,

*Defendant-Appellant.*

————————————

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:21-cr-20005-DPG-1

————————————

Before NEWSOM, LAGOA, and KIDD, Circuit Judges.

LAGOA, Circuit Judge:

Alberico Ahias Crespo was convicted of conspiracy to commit witness tampering, three counts of witness tampering, and conspiracy to obstruct justice and was sentenced to 97 months' imprisonment. Crespo now appeals his convictions and sentence. He

argues that the district court erred by denying his motion to suppress wiretap evidence, denying his motion for mistrial after the jury heard false testimony and a prosecutor's bad-faith question, denying him recross-examination of a witness at trial, and admitting into evidence past bad acts.  He also argues that the cumulative effect of these errors and other inadmissible evidence warrants reversal of his conviction.  Moreover, Crespo argues that the jury lacked sufficient evidence to convict him under Counts Five, Seven, Eight and Ten of the superseding indictment and that the district court erred by rejecting his proposed jury instruction on a good-faith defense.  Finally, he argues that his sentence was miscalculated.

After careful consideration and with the benefit of oral argument, we affirm Crespo's convictions and sentence.

## I.    FACTUAL AND PROCEDURAL HISTORY

Crespo, a special agent with the United States Department of Health and Human Services ("HHS"), was a member of the Southern District of Florida's Health Care Fraud Strike Force (the "Strike Force"), an interagency task force focusing on health care fraud and related narcotics trafficking in South Florida.

From November 2016 to July 2020, Crespo, Jorge Diaz Gutierrez, Anais Lorenzo, Dr. Rodolfo Gonzalez-Garcia, and Yandre Trujillo Hernandez, among others, participated in a scheme to obtain oxycodone and distribute it for street-level profit (the "Oxycodone Scheme").  Here's how the scheme worked.  Diaz acted

as a "patient recruiter" who brought patient recruits, such as Lorenzo, to clinics to be prescribed unnecessary oxycodone. Dr. Gonzalez was a medical doctor at West Medical Office in Hialeah, Florida ("West Medical"), one of the clinics where patient recruits were directed, who would prescribe the oxycodone. Diaz would then buy oxycodone from those patient recruits and sell the pills to individuals, such as Trujillo, for street-level profit. Crespo, who was Diaz's roommate and knew of Diaz's oxycodone trafficking, would pass along information about the Strike Force's ongoing investigations into the Oxycodone Scheme and disrupt the investigation where he could.

On January 5, 2021, a federal grand jury returned a ten-count indictment against Crespo, Diaz, Trujillo, and Lorenzo.[1] Specifically, Crespo was indicted for conspiracy to distribute and possess with intent to distribute oxycodone, in violation of 21 U.S.C. §§ 841(a)(1) and 846 (Count One); conspiracy to commit witness tampering, in violation of 18 U.S.C. §§ 1512(b)(3) and 1512(k) (Count Five); three counts of witness tampering, in violation of 18 U.S.C. § 1512(b)(3) (Counts Seven through Nine); and conspiracy to obstruct justice, in violation of 18 U.S.C. §§ 1512(c)(2) and 1512(k) (Count Ten).

---

[1] Dr. Gonzalez was indicted separately, and Diaz, Trujillo, and Lorenzo pleaded guilty before trial.

### A.    Investigation and Offense Conduct

At trial, the government elicited the following evidence through witness testimony and exhibits.

In April 2018, the Strike Force began investigating West Medical and Dr. Gonzalez for illegal distribution of oxycodone. The lead agents for the investigation were HHS Special Agent Rolando Alvarez and FBI Special Agent Charles Lawless (each special agent, an "SA"). The goal of this investigation, as with all other Strike Force investigations, was to obtain a grand jury indictment against the scheme's participants.

Crespo was not involved in the investigation, but he shared a cubicle space with SA Alvarez and participated in meetings where the investigation was discussed. Crespo disclosed neither his relationship with Diaz nor his knowledge of Diaz's role in the Oxycodone Scheme to his supervisors. In one instance, Crespo alerted Diaz to the investigation into West Medical and told him to stop bringing patients there. Diaz continued operations with other clinics.

Even after Dr. Gonzalez was indicted on January 31, 2019, the investigation into the Oxycodone Scheme continued. The investigation identified Diaz as a patient recruiter after he tried to purchase oxycodone from a confidential source and after an anonymous letter alleged that Diaz and Dr. Gonzalez were working together. Though the impetus for the investigation is not clear from the record, the FBI public corruption squad, including SA Sean Slattery, also began investigating Crespo for public corruption in April

2019. As part of the Strike Force's investigation into Diaz, agents wiretapped Diaz's phone and learned that he frequently communicated with Crespo about the Strike Force's ongoing investigation.

On July 8, 2020, Crespo and other HHS agents received an email from SA Lawless requesting assistance with interviewing patient recruits involved in the Oxycodone Scheme. Upon receiving the email, Crespo told his supervisor, HHS Special Agent Jesus Barranco, that those patient recruits were diagnosed with COVID. When pressed about how he knew, Crespo was evasive and responded that his source was a "street person" and an "old man," but did not give the actual identity of his source. As a result of Crespo's actions, the FBI agents proceeded with the interviews, but the HHS agents did not.[2]

On July 17, 2020, Crespo and Diaz spoke on the phone several times while Crespo and his co-worker, HHS Agent Henry Luna ("Agent Luna"), were drinking heavily at a bar. During one call, Crespo directed Diaz to call SA Lawless to schedule a meeting. Crespo instructed Diaz to cut his pills into quarter portions to convince SA Lawless that Diaz was taking oxycodone for health reasons, tell SA Lawless that he did not sell pills to anyone and had done nothing wrong, and insist that SA Lawless and Diaz meet in public to prevent the Strike Force from learning that Diaz and Crespo lived together.[3]

---

[2] These facts were the basis for witness tampering Count Seven.

[3] These facts were the basis for witness tampering Count Eight.

On July 20, 2020, Crespo spoke with SA Lawless about Diaz. When asked if he had any information as to whether Diaz was involved with oxycodone distribution, Crespo denied any knowledge and expressed that Diaz was a good person who had never done anything wrong. Crespo continued by saying that if he knew about Diaz's drug trafficking, he would have arrested him.[4]

On July 21, 2020, Diaz and Crespo were arrested. On January 14, 2021, Crespo was arraigned.

## B.      Pre-Trial Proceedings

During pre-indictment discovery, the government produced, among other documents, Title III wire and electronic interception recordings from Diaz's phone and related materials, including the wiretap application.[5] Partly because of the large volume of discovery produced, trial was postponed numerous times during the proceedings below. In the interim, the government continued to produce relevant documents, including a 2018 FBI incident summary report that was produced to Crespo on July 5, 2022 ("FBI Incident Summary Report").

On October 10, 2022, more than eighteen months after his arraignment and approximately two months before trial was set to begin, Crespo filed a motion to suppress the wiretap evidence. Crespo argued that his communications were unlawfully intercepted because the government did not establish that other investigatory

---

[4] These facts were the basis for witness tampering Count Nine.

[5] *See generally* 18 US.C. § 2518.

procedures were inadequate and because the wiretap applications failed to establish probable cause to support the wiretap orders. Crespo neither provided a reason for his delayed filing nor acknowledged that the motion was untimely under Southern District of Florida Local Rule 88.9(c), which requires that such motions be filed within twenty-eight days after a defendant's arraignment. The district court denied Crespo's motion to suppress as untimely.

On October 14, 2022, Crespo filed a motion to reconsider and argued that good cause excused his delay in filing his motion to suppress because, despite the multiple joint stipulations to continue trial, the attorneys neglected to extend the deadlines for pretrial motions. Crespo further argued that his delay should be excused because the government produced the FBI Incident Summary Report, which Crespo alleged was key to the government's wiretap application, over a year after his arraignment. The district court denied Crespo's motion for reconsideration in a paperless order.

### C.    Trial Proceedings

After a thirteen-day trial, the jury acquitted Crespo of Count One but convicted him of all other Counts. The trial proceedings are summarized below.

#### 1.  Witness Testimony

Relevant to the instant appeal, four individuals were called to the witness stand. The government called three SAs—FBI SAs Lawless and Slattery and HHS SA Barranco—to testify about their investigation into Crespo and the Oxycodone Scheme. Crespo's

defense counsel called Agent Luna to testify about his experience working with Crespo.

SA Lawless testified about his conversation with Crespo on July 20. The government and SA Lawless had the following exchange about a transcript of that call:

> Q: If we go down, where you state, "We have some information that [Diaz is] involved with Oxy distribution. Have you ever seen him do anything like that?" When you use the term "seen him," what are you referring to?
>
> A: Well, we had prior information that Mr. Crespo was with Diaz when he engaged [sic] the illegal distribution of Oxy, such as buying and selling Oxycodone.

Crespo objected and moved for a mistrial, noting that the government did not have evidence of Crespo being present when Diaz sold drugs. The government had no objection to striking the answer. The district court denied the mistrial motion but provided a curative instruction:

> With regard to the last statement made by the agent, I am going to ask that you disregard that statement which related to Mr. Crespo being present when Mr. Diaz bought or sold Oxycodone. The parties stipulate that there is no evidence that Defendant Crespo was with Mr. Diaz when he bought or sold Oxycodone.

SA Barranco testified about Crespo's July 8th attempt to prevent the Strike Force from interviewing Diaz's patient recruits. The following exchange took place between the government and SA Barranco:

> Q: At no time did he ever reveal the fact that it was Jorge Diaz that was the source of this information?
>
> A: No.

Crespo objected and moved for a mistrial because the question was asked in bad faith and implied that Diaz, who had pleaded guilty and was cooperating with the government, was the source of the information about the patients having COVID. The district court denied the mistrial motion but provided a curative instruction:

> Ladies and gentlemen, please disregard [the government's] last  question to this witness.  I do want to remind you, as I have already told you in my instructions, that what the attorneys say during the trial is not evidence.  Likewise, their questions are not evidence and you should not consider it as such.

SA Slattery testified about his investigation into Crespo for public corruption.  Two instances in SA Slattery's testimony are relevant for the present appeal.

First, SA Slattery testified about his discovery that Crespo was buying and selling personal protective equipment ("PPE") for uses related to COVID and how the conduct was not pre-approved by Crespo's supervisors, as required by HHS policy.  While on the

witness stand, SA Slattery was presented with Crespo's email communications that corroborated the testimony.  Crespo objected that selling PPE was irrelevant to the oxycodone-related charges and argued that the jury should be instructed that violation of a work policy is not a criminal offense.  The government stated that this evidence showed Crespo's state of mind in engaging in unapproved conduct, and it countered defense counsel's depiction of Crespo as an exemplary agent. Defense counsel drafted a curative instruction, which the district court read to the jury:

> Ladies and gentlemen, during the testimony you may hear some evidence regarding alleged administrative or internal policy violations, but I do want to remind you that the defendant is on trial for the crimes or the charges set forth in the indictment.  I will give you further instructions on that point later.

At the end of trial, the district court also instructed the jury on this issue:

> During this trial, you have heard testimony regarding government or employment policies and procedures regarding ethical standards and standards of action for certain employees of government agencies.  I caution you that a violation of these policies and procedures, standing alone, is not a crime.  This is not a civil case. The defendant is not on trial for violating policies and procedures.

Second, on cross-examination, defense counsel asked SA Slattery about an office near West Medical that Crespo rented for a side business, whose lease he did not renew after the Strike Force began investigating the clinic. SA Slattery could not definitively say that Crespo knew West Medical was nearby or that Crespo closed the office because he knew of Dr. Gonzalez's impending indictment. On redirect, the government used admitted exhibits to show the temporal proximity between the office closure and Crespo's knowledge of the investigation. Specifically, SA Slattery confirmed that Crespo expressed his intent not to renew the lease after he warned Diaz about the investigations into West Medical and after the Strike Force received an anonymous letter connecting Diaz to Dr. Gonzalez and the clinic. Defense counsel requested permission to conduct a recross-examination and alleged that new issues and exhibits were introduced. The government objected that the issues he covered on redirect were raised on cross-examination. The district court sustained the objection and did not permit recross-examination.

Agent Luna testified about his experience working with Crespo at HHS and the day he and Crespo were drinking at the bar on July 17. During cross-examination, the government asked whether Crespo was quick to anger or prone to violence. Agent Luna denied that Crespo was either, but noted that if Crespo didn't like something, he would voice his opinion and that Crespo was well trained and capable of responding to any situation. Defense counsel neither objected to the government's questions nor Agent Luna's answers.

### 2. Evidence Introduced at Trial

The government presented three pieces of evidence that are disputed in the present appeal.

First, the prosecutor played a voicemail recording of Crespo threatening Lorenzo because he believed Lorenzo would report the Oxycodone Scheme to the police. The voicemail was played a total of three times during trial: first, to SA Slattery, next, to Lorenzo, and last, to Diaz. Defense counsel only objected to the recording being played before Lorenzo and argued that playing the voicemail a second time for the jury was cumulative and prejudicial. The district court overruled the objection.

Second, the government introduced the transcript of a July 17 call between Crespo and Diaz about the ongoing investigation (the "July 17 Transcript") as an exhibit. The transcript was used a total of four times during trial: first, with SA Slattery, next, with SA Lawless, then again with SA Slattery, and last, with Diaz. Defense counsel only objected when the transcript was before Diaz, alleging that the translation was wrong because it said that Crespo would "make up a story" when it should have said that that Crespo would "tell him a story." The district court overruled the objection because the transcript was made available before trial and the time to object to the translation had passed.

Third, the government presented SA Barranco with photographs of a knife found with Crespo when he was arrested. The following exchange between the government and SA Barranco took place:

> Q: Agent Barranco, I … ask if you recognize the contents of those photographs?
>
> A: It's a knife.
>
> Q: And was the defendant arrested in possession of a knife by the FBI?
>
> A: I wasn't present at the arrest but I was informed–

Defense counsel objected on the grounds that Agent Barranco lacked personal knowledge. The district court sustained the objection.

### 3. Motion for Judgment of Acquittal and Jury Instructions

At the conclusion of trial, Crespo moved for judgment of acquittal and argued that there was insufficient evidence that he acted with a corrupt purpose; engaged in misleading conduct or that he did so knowingly; corruptly persuaded another person against communicating with law enforcement; and knowingly or willfully joined the conspiracy. The district court, viewing the evidence in the light most favorable to the government, denied the motion and concluded that there was sufficient evidence to proceed.

Crespo also requested that the district court issue a "good-faith defense" jury instruction. Crespo's theory for submitting the instruction was that he did not act with intent to obstruct the investigation, but with intent to assist or help his friend, Diaz. In support of the instruction, Crespo cited good-faith defenses used in criminal tax and civil fraud contexts. The irrelevance of the cited

authority notwithstanding, the district court denied the request because it concluded that there was no evidentiary basis to give the instruction. Instead, the district court instructed the jury on the state of mind required to convict Crespo for each of the charges, including defining the words "knowing," "willful," "corrupt persuasion," and "misleading conduct," as used in the statutes criminalizing witness tampering and obstruction of justice. *See* 18 U.S.C. §§ 1512(b)(3), (c)(2).

## D.    Sentencing

In preparation for sentencing, a Presentence Investigation Report ("PSI") calculated the drug quantity attributed to each participant in the Oxycodone Scheme. Throughout the lifetime of the scheme, Dr. Gonzalez illegally prescribed over 1.3 million oxycodone pills, 23,636 of which were distributed to Diaz. Of the portion distributed to Diaz, the PSI determined that 4,563 kilograms of converted drug weight were attributable to Crespo.

Because each of Crespo's convictions was for a violation of 18 U.S.C. § 1512, the PSI determined that the relevant sentencing guideline for his offense was U.S.S.G. § 2X3.1(a)(1), by way of a cross-reference provision in U.S.S.G. § 2J1.2(c)(1). This guideline provides that the base offense level is six levels lower than the base offense level for the underlying offense. The PSI determined that the relevant guideline for the underlying offense—Diaz's conspiracy to distribute oxycodone—was U.S.S.G. § 2D1.1. Under that guideline, Crespo's 4,563 kilograms of converted drug weight

placed the underlying offense's base offense level at 32 and, therefore, Crespo's base offense level at 26. After additional adjustments accounting for Crespo's position of public trust, his obstruction of justice, and lack of criminal history, his guideline sentencing range was 78–97 months' incarceration followed by a term of 1–3 years' supervised release.

At the sentencing hearing held in January 2024, the parties objected to the drug quantity attributed to Crespo and his corresponding base offense level. The government argued that the oxycodone trafficked from the entire Oxycodone Scheme, and not just those prescribed by Dr. Gonzalez, should be attributed to Crespo. Crespo argued that he should not be responsible for any pills that he did not sell or know about. The district court overruled both objections and adopted the PSI's calculation of Crespo's base offense level. Crespo was sentenced to 97 months' imprisonment followed by three years of supervised release.

Crespo now timely appeals his convictions and sentence.

## II.    STANDARDS OF REVIEW

We review the district court's denial of a motion to suppress as untimely, limits on cross examination, evidentiary rulings, denial of a motion for a mistrial, and refusal to give a proposed jury instruction for abuse of discretion. *See United States v. Gyetvay*, 149 F.4th 1213, 1231 (11th Cir. 2025) (motion to suppress); *United States v. Jeri*, 869 F.3d 1247, 1262–63 (11th Cir. 2017) (recross-examination); *S. Grande View Dev. Co., Inc. v. City of Alabaster*, 1 F.4th 1299, 1305 (11th Cir. 2021) (evidentiary rulings); *United States v. Wright*,

392 F.3d 1269, 1274 (11th Cir. 2004) (mistrial); *United States v. Polar*, 369 F.3d 1248, 1252 (11th Cir. 2004) (jury instructions). "A district court abuses its discretion when it applies an incorrect legal standard, applies the law in an unreasonable or incorrect manner, follows improper procedures in making a determination, or makes findings of fact that are clearly erroneous." *United States v. McLean*, 802 F.3d 1228, 1233 (11th Cir. 2015) (citation modified).

If a district court did not abuse its discretion in denying a motion to suppress as untimely, we review the underlying merits of the motion for plain error. *United States v. Andres*, 960 F.3d 1310, 1315–16 (11th Cir. 2020). Under this standard, we will reverse a district court's decision only if "(1) an error occurred; (2) the error was plain; (3) it affected [the appellant's] substantial rights; and (4) it seriously affected the fairness of the judicial proceedings." *Id.* at 1316.

We review the cumulative impact of trial errors and the district court's denial of a motion for judgment of acquittal *de novo*. *United States v. Pendergrass*, 995 F.3d 858, 881 (11th Cir. 2021) (cumulative error); *United States v. Gamory*, 635 F.3d 480, 497 (11th Cir. 2011) (motion for judgment of acquittal).

This Court reviews for clear error a district court's factual findings as to the drug quantity attributable to a defendant. *United States v. Dixon*, 901 F.3d 1322, 1347 (11th Cir. 2018). But we review *de novo* a district court's interpretation and application of the Sentencing Guidelines. *United States v. James*, 135 F.4th 1329, 1332 (11th Cir. 2025).

## III.    ANALYSIS

On appeal, Crespo advances several arguments.  He argues that the district court erroneously denied his motion to suppress wiretap evidence, denied his motion for mistrial after the jury heard false testimony and a prosecutor asked a bad-faith question, denied him recross-examination of a witness at trial, and admitted character evidence of his past bad acts.  He also argues that the cumulative effect of these errors and other inadmissible evidence introduced at trial prejudiced his right to a fair trial.  Furthermore, Crespo argues that the jury lacked sufficient evidence to convict him under Counts Five, Seven, Eight and Ten of the superseding indictment and that the district court erred by rejecting his proposed jury instruction on a good-faith defense.  Finally, he argues that his sentence was miscalculated.  We address each issue in turn.

### A.    Motion to Suppress

Crespo contends that the district court erred in denying his motion to suppress as untimely and argues that good cause justified his untimely filing for two reasons.  First, Crespo argues that at the time the parties stipulated to continue trial, they forgot to continue the deadlines for pretrial motions.  Second, he maintains that documents that negated statements in the wiretap application were not produced until after the deadline to file his motion.

Federal Rule of Criminal Procedure 12 provides that motions for suppression must be filed before trial and that the district court may set a deadline for such motions.  Fed. R. Crim. P. 12(b)(3)(C), (c)(1).  Rule 12 continues by stating that "[i]f a party

does not meet the deadline for making a Rule 12(b)(3) motion, the motion is untimely." *Id.* at (c)(3). "But a court may consider the [motion to suppress] if the party shows good cause." *Id.*

As to Crespo's first argument, we conclude that the parties' failure to request an extension of the deadline for pretrial motions does not constitute good cause. In *Andres*, we held that "[n]either a strategic decision nor inadvertence constitutes good cause." 960 F.3d at 1316. Because "the defendant had all the information necessary to bring a Rule 12(b) motion before the date set for pretrial motions, but failed to file it by that date," we concluded that the district court did not abuse its discretion when it denied a defendant's motion to suppress as untimely. *Id.* (citing *United States v. Curbelo*, 726 F.3d 1260, 1267 (11th Cir. 2013)). Here, Crespo's argument that attorney neglect to extend the pretrial motion deadline caused the delay is the precise "inadvertence" that we have held does not "constitute good cause." *See id.*

As to Crespo's second argument, we conclude that the government's delay in producing the FBI Incident Summary Report was not good cause for Crespo's own delay. In *Gyetvay*, we held that the government's delay in document production was not good cause for the defendant's own delay in "fil[ing] his motion to suppress before trial." 149 F.4th at 1232. There, we recognized that the defendant did not receive a copy of the disputed evidence until the deadline to file a motion to suppress. *Id.* at 1231. Yet in filing his untimely motion, the defendant did not "acknowledge the motion's untimeliness" or "show good cause to excuse his eleven-

month delay" after receiving the evidence. *Id.* at 1231–32. We observed that "[a] district court's scheduling order is not a frivolous piece of paper, idly entered, which can be cavalierly disregarded by counsel without peril." *Id.* at 1232. Because "the court simply enforced its own deadline," it did not abuse its discretion in denying the defendant's motion to suppress as untimely. *Id.*

Here, the district court similarly did not abuse its discretion when it enforced its own deadline for a motion to suppress. To be sure, Crespo received the FBI Incident Summary Report over a year after the pretrial motion deadline passed. But in his motion to suppress, Crespo neither acknowledged his motion's untimeliness nor showed good cause as to why the motion was filed over ninety days after he received the FBI Incident Summary Report and only sixty days before the scheduled trial date, as required by Rule 12(c)(3). Indeed, in the interim, Crespo filed a motion to continue trial and other motions but did not promptly notify the district court of the new evidence he received. Furthermore, Crespo fails to articulate what statements in the FBI Incident Summary Report called into question the veracity of the wiretap application such that he did not have "all the information necessary" to file his motion before the deadline set by the district court. Indeed, many of the wiretap application statements that Crespo quotes in his briefing do not reference the information from the FBI Incident Summary Report, which means he could have raised these issues when he first received the application. Thus, the district court's denial of Crespo's motion to suppress as untimely was not an abuse of discretion.

Because the district court did not abuse its discretion in denying Crespo's motion to suppress as untimely, we review the underlying merits of his motion for plain error. *See id.*; *Andres*, 960 F.3d at 1315–16. Crespo's argument fails at the outset because we find no error in admitting the wiretap evidence.

Crespo argues that the FBI Incident Summary Report negated the reasons justifying a wiretap of Diaz's phone in the wiretap application. According to Crespo, the application stated that Diaz told a confidential source that Crespo knew Diaz bought and sold oxycodone pills and that Crespo would turn a blind eye to the illegal trafficking. Crespo alleges that this contradicted the notes in the FBI Incident Summary Report. According to that report, the informant did not know whether Diaz was bragging about his friendship with Crespo or telling the truth and stated that he did not believe Crespo was corrupt.

Crespo's arguments are unavailing for two reasons. First, the wiretap application is not in the record; Crespo only proffers what he alleges are direct quotations of the application in his appellate briefs, which only cite to his motion to suppress. Even in his motion below, he did not provide the application from which he allegedly quotes. We do not consider facts outside the record and Crespo has "abandoned" the merits of his appeal by failing to give "citations to the authorities and parts of the record on which [he] relies." *Doe v. Moore*, 410 F.3d 1337, 1349 n.10 (11th Cir. 2005).

Second, even if Crespo's quotations of the application are accurate, we do not find any falsehoods or omissions that eliminate

probable cause or warrant a *Franks* hearing. *See Franks v. Delaware*, 438 U.S. 154, 155–56 (1978). "An application for a wiretap authorization must be supported by the same probable cause necessary for a search warrant." *United States v. Nixon*, 918 F.2d 895, 900 (11th Cir. 1990). And "[t]o obtain a *Franks* hearing, a defendant must not only show that the affiant made false statements or omissions 'intentionally or with reckless disregard for the truth,' but also that the false statements or omissions were 'necessary to the finding of probable cause.'" *United States v. Goldstein*, 989 F.3d 1178, 1197 (11th Cir. 2021) (quoting *United States v. Kapordelis*, 569 F.3d 1291, 1309 (11th Cir. 2009)).

Here, we find no false statements or omissions in the wiretap application, let alone any that were necessary to finding probable cause. For example, an informant could both be told by Diaz that Crespo would alert him if he was being investigated and not know whether Diaz was bragging or telling the truth. In addition, an informant could both be told by Diaz that Crespo would turn a blind eye to Diaz's illegal drug trafficking and think that Crespo was not corrupt. Diaz's statements to the informant sufficed to establish probable cause with respect to the target of the wiretap: Diaz.[6]

---

[6] Perhaps recognizing this, Crespo argues that he was the true target of the wiretap. But his self-serving version of the facts ignores that agents can continue collecting wiretap evidence even after the investigated crime is completed. *See Goldstein*, 989 F.3d at 1193 ("Depending on the circumstances," such as evidence of an "ongoing conspiracy," "a valid wiretap may issue after a crime is complete so long as there is probable cause that evidence of the completed crime will be found.").

*See United States v. Domme*, 753 F.2d 950, 954 n.2 (11th Cir. 1985) ("A wiretap application need not provide probable cause of criminal activity for each person named in an application."). As to any omissions, without the full application in the record before us, Crespo "fails to raise the issue sufficiently for discussion." *See Moore*, 410 F.3d at 1349 n.10.

We thus conclude that the district court did not abuse its discretion in denying Crespo's motion to suppress as untimely, nor did it err in admitting the wiretap evidence. We turn next to Crespo's argument regarding the motion for mistrial.

## B.    Motion for Mistrial

Crespo also appeals the denial of his two motions for a mistrial. First, Crespo argues that SA Lawless's false testimony at trial, that Crespo was present when Diaz bought and sold oxycodone, had a substantial influence on the jury's verdict. Second, Crespo argues that the prosecutor's question about Crespo receiving information from Diaz about the interviewees having COVID had a similar influence. We are unpersuaded by both arguments.

The district court has discretion to grant a mistrial since it "is in the best position to evaluate the prejudicial effect of a statement or evidence on the jury." *United States v. Delgado*, 321 F.3d 1338, 1346–47 (11th Cir. 2003). And "[w]hen the district court gives a curative instruction" to remedy the potentially prejudicial effect of a statement, "we presume that the jury followed it." *United States v. Gallardo*, 977 F.3d 1126, 1138 (11th Cir. 2020). We will reverse the district court's denial of a mistrial "only if the evidence is

so highly prejudicial as to be incurable by the trial court's admonition." *Delgado*, 321 F.3d at 1347 (citation modified).

Here, the district court gave the jury curative instructions for both instances that allegedly warrant mistrial. As to Crespo's presence when Diaz bought and sold oxycodone, the district court instructed that SA Lawless's statement was to be disregarded and that there was no evidence supporting his statement. As to the prosecutor's suggestion that Diaz was the source of the false information used to deter HHS's interview of the patient recruits, the district court instructed the jury that they should disregard the prosecutor's question and reminded the jury that what attorneys say and the questions they ask are not evidence. Having provided curative instructions, "we presume that the jury followed it." *Gallardo*, 977 F.3d at 1138.

Crespo nevertheless argues that the testimony incorrectly painted Crespo as a corrupt federal agent who looked the other way while Diaz bought and sold oxycodone. But Crespo fails to show that the colloquies were "so prejudicial that no instruction could cure it." *See Gallardo*, 977 F.3d at 1139. To start, the jury acquitted Crespo of the conspiracy-to-distribute count, suggesting that the alleged error in SA Lawless's testimony was curable. And regardless of whether the false information relating to the patient recruits came from Diaz, the jury was at liberty to conclude, in assessing the credibility of SA Barranco's testimony about his conversation with Crespo and other trial evidence, that Crespo lied to SA

Barranco and impeded the Strike Force's investigation by dissuading HHS agents from interviewing those patients. Any contrary interpretations were for Crespo's trial counsel to establish.

We thus conclude that the district court did not abuse its discretion in denying Crespo's motion for a mistrial.

### C.    Recross Examination of SA Slattery

Next, Crespo argues that the district court erred in denying recross-examination of SA Slattery because he was entitled to ask questions about issues that went beyond the scope of redirect. Specifically, Crespo argues that the government raised new matters in redirect when it asked SA Slattery about the anonymous letter that accused Diaz and Dr. Gonzalez of drug trafficking and the time when Crespo warned Diaz about the Strike Force's investigation into West Medical. The government responds that it did not raise a new matter because the evidence was already in the trial record and its questions about the evidence directly responded to defense counsel's questions on cross examination. The government is correct.

"[A]s opposed to cross-examination, a defendant has no constitutional right to recross-examination." *Jeri*, 869 F.3d at 1262–63 (citing *United States v. Ross*, 33 F.3d 1507, 1517–18 (11th Cir. 1994)). "Rather, he has only a limited right to recross-examination where a new matter is brought out on redirect examination." *Id.* (citation modified).

Here, Crespo fails to show that the government introduced new matters during its redirect examination of SA Slattery. Defense counsel's questions on cross-examination suggested that Crespo's decision to terminate his lease for his office near West Medical was independent of the Strike Force's investigation into Dr. Gonzalez and the clinic. Defense counsel successfully established that SA Slattery could neither definitively say that Crespo knew West Medical was nearby nor that Crespo closed the office because he knew of Dr. Gonzalez's impending indictment. The government's questions on redirect indicated that the evidentiary purpose of the anonymous letter and Crespo's conversation with Diaz about the investigation into West Medical, both of which were already in the trial record, was directly responsive to the theory on cross examination—why Crespo decided not to renew his lease. During redirect, the government revealed the temporal proximity between Crespo's decision and the Strike Force's progress in their investigation into Dr. Gonzalez and West Medical, which is not anything new that Crespo should have been given an opportunity to address.

We thus conclude that the district court did not abuse its discretion in denying defense counsel's request for recross-examination.

### D.    Rule 404(b)

Crespo also argues that the district court erred in admitting his past-acts of buying and selling PPE into evidence because the

implied propensity to commit crimes was prejudicial to the jury's verdict.

Rule 404(b) states that "[e]vidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b). "[R]egardless of whether the activity might give rise to criminal liability," the test for admissibility under this rule is a three-part inquiry. *United States v. Dickerson*, 248 F.3d 1036, 1046 (11th Cir. 2001). First, "[t]he evidence must be relevant to an issue other than the defendant's character." *United States v. Elysee*, 993 F.3d 1309, 1347 (11th Cir. 2021). Second, "sufficient evidence must be presented to allow a jury to find that the defendant committed the extrinsic act." *Id*. And third, "the probative value of the evidence must not be substantially outweighed by its undue prejudice." *Id*. In this inquiry, we recognize that the district court "is afforded broad discretion in deciding the admissibility of extrinsic act evidence, and as stated earlier, its decision will not be reversed absent an abuse of discretion." *United States v. Dorsey*, 819 F.2d 1055, 1060 (11th Cir. 1987).

As to the first prong, Crespo argues that the PPE evidence was admitted to suggest Crespo's bad character. But after Crespo's objection at trial, the government stated that the evidence was introduced to show Crespo's state of mind. The government's theory was that the PPE evidence showed Crespo was engaging in conduct not approved by HHS, indicating Crespo's lack of respect for HHS and its policies. With this evidence, a jury could reasonably

conclude that Crespo's witness tampering and conspiracy to obstruct justice were similarly intentional. We have held that this is a permissible use of extrinsic acts. *Dorsey*, 819 F.2d at 1060 ("Where the extrinsic offense is offered to prove intent, its relevance is determined by comparing the defendant's state of mind in perpetrating both the extrinsic and charged offenses.").

As to the second prong, Crespo argues that the PPE-related emails did not sufficiently show that he was buying and selling PPE without HHS's approval. To be sure, the text of the emails alone may not have indicated that this was the case. But SA Slattery elaborated on the emails and testified that HHS supervisors did not approve Crespo's conduct. In this respect, the emails confirmed that Crespo did buy and sell PPE outside of his work at HHS.

As to the third prong, Crespo argues that the evidence was prejudicial because it suggested that Crespo was a bad person who did bad things. Though the jury could have concluded that this was the case, the "evidence [was not] so highly prejudicial as to be incurable." *Delgado*, 321 F.3d at 1347 (citation modified). Indeed, Crespo's defense counsel himself penned the curative instruction for the jury, and the district court provided its own instruction at the end of trial. The jury was thus instructed both times that Crespo was on trial for the crimes charged in the indictment and any testimony about a violation of government or employment policies and procedures, standing alone, was not a crime.[7]

---

[7] Crespo also argues that the curative instruction provided at the end of trial was wrong when it stated that "a violation of these policies and procedures,

We thus conclude that the district court did not abuse its discretion by admitting the PPE evidence at trial.

### E.    Cumulative Errors

Crespo argues that the district court committed four errors in addition to those discussed above that together warrant a new trial: (1) allowing the government to replay the voicemail Crespo left for Lorenzo three times before the jury; (2) admitting into evidence the July 17 Transcript despite an allegedly incorrect translation; (3) sustaining his objection to testimony about his knife but doing nothing further; and (4) taking no curative steps after the government asked Agent Luna about Crespo's temperament.

"The cumulative error doctrine provides that an aggregation of non-reversible errors (i.e., plain errors failing to necessitate reversal and harmless errors) can yield a denial of the constitutional right to a fair trial, which calls for reversal." *Morris v. Sec'y, Dep't of Corr.*, 677 F.3d 1117, 1132 (11th Cir. 2012). "We address claims of cumulative error by first considering the validity of each claim individually, and then examining any errors that we find in the aggregate and in light of the trial as a whole to determine whether the appellant was afforded a fundamentally fair trial." *Id.* With

---

standing alone, is not a crime" because the term "standing alone" was vague. But he cites no case law in support of his position and does not explain why the term is vague. Indeed, "[s]o long as the instructions accurately reflect the law, the trial judge is given wide discretion as to the style and wording employed in the instructions." *See United States v. Starke*, 62 F.3d 1374, 1380 (11th Cir. 1995).

these principles in mind, we address Crespo's arguments regarding cumulative errors and begin with the voicemail evidence.

### 1. *Voicemail Evidence*

Crespo argues that playing the recorded voicemail he left for Lorenzo during SA Slattery's, Lorenzo's, and Diaz's testimony was unduly prejudicial because it implied that Crespo was an angry and violent person, which had nothing to do with the charges against him. *See* Fed. R. Evid. 403.[8]

Rule 403 states that a "court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . needlessly presenting cumulative evidence." Fed. R. Evid. 403. It "is an extraordinary remedy which the district court should invoke sparingly, and the balance should be struck in favor of admissibility." *United States v. Lopez*, 649 F.3d 1222, 1247 (11th Cir. 2011) (quoting *United States v. Alfaro-Moncada*, 607 F.3d 720, 734 (11th Cir. 2010)). The rule requires us to "look at the evidence in a light most favorable to its admission, maximizing its probative value and minimizing its undue prejudicial impact." *Id.*

Here, the probative value of the voicemail was not outweighed by the danger of replaying it. To start, the voicemail was properly played during Lorenzo's testimony because it allowed her to explain Crespo's threats and their relation to her intent to speak

---

[8] Recall that Crespo objected only during Lorenzo's testimony but did not object during SA Slattery's or Diaz's testimony.

to law enforcement about the Oxycodone Scheme. Next, the evidentiary purpose of playing the voicemail during Diaz's testimony was to corroborate that Crespo used Diaz's phone to leave the voicemail for Lorenzo. We thus conclude that the district court did not err by allowing the voicemail recording to be played multiple times because any prejudicial effect did not substantially outweigh the probative value of replaying the voicemail before Lorenzo and Diaz. We turn next to Crespo's argument regarding the July 17 Transcript.

### 2. July 17 Transcript

Crespo argues that the alleged mistranslation of one line from the July 17 Transcript swayed the outcome of trial. But the translation was available before trial for Crespo's inspection and he did not object to the translation then or any other time it was used at trial. Indeed, when the same transcript was presented to other trial witnesses, Crespo neither asked any witness about a possible alternate translation nor requested a curative instruction. Even if the translation was incorrect, there was overwhelming evidence in the remainder of the July 17 Transcript and Crespo's subsequent statements to SA Lawless from which the jury could infer that Crespo was obstructing the investigation. *See United States v. Phaknikone*, 605 F.3d 1099, 1109 (11th Cir. 2010). For example, Crespo specifically told Diaz what to say to SA Lawless and when Crespo spoke to SA Lawless a few days later, Crespo lied about his knowledge of Diaz's drug trafficking.

### 3. Knife Evidence

Third, Crespo argues that the government's suggestion that he was arrested in possession of a knife was an improper attack on his character. Crespo's failure to raise this specific objection at trial or "move to strike any of the problematic testimony" means that the admission of the evidence is reviewed for plain error. *See United States v. Spila*, 136 F.4th 1296, 1308–09 (11th Cir. 2025) (citation modified).

We conclude that the district court did not err, let alone plainly err, by admitting SA Barranco's statements. Prior testimony already revealed that knives were found in Crespo's vehicle at the time of his arrest, and Crespo's objection that SA Barranco lacked personal knowledge about the knife was sustained. After successfully objecting, Crespo did not move to strike SA Barranco's statements or request a curative instruction. Indeed, it is unclear what more could have been done in response to Crespo's objection, especially because Crespo did not object on improper-character-evidence grounds. We thus conclude that the district court did not err in sustaining Crespo's objection and taking no further curative action. *See United States v. Daniels*, 91 F.4th 1083, 1099 (11th Cir. 2024) (holding that the district court did not err or plainly err when it did not strike testimony *sua sponte*).

### 4. Agent Luna's Testimony

Lastly, Crespo argues that the government's cross examination of Agent Luna improperly asked about Crespo's tempera-

ment. Because Crespo "failed to preserve [this issue] by unambiguously flagging the mistake and contemporaneously objecting," we review the district court's admission of the testimony for plain error. *Id.* at 1095 (citation modified). "The admission of evidence constitutes plain error when the evidence was so obviously inadmissible and prejudicial that, despite defense counsel's failure to object, the district court, *sua sponte*, should have excluded the evidence." *Id.*

Crespo's arguments that the district court erred, let alone plainly erred, are unpersuasive. The government's colloquy with Agent Luna was not "so obviously inadmissible" because the government's questions were related to Crespo's defense theory. *See id.* The trial record indicates that Crespo attributed his temperament on July 17 to being drunk, and the questions asked by the prosecutor probed whether he was ordinarily quick to anger or prone to violence. Nor do we conclude that the prosecutor's questions were "so obviously . . . prejudicial." *See id.* During cross examination, Agent Luna did not agree that Crespo was quick to anger or prone to violence, and repeatedly during trial, the district court instructed the jury that an attorney's questions were not evidence. In "maximizing," *see Lopez*, 649 F.3d at 1247, the probative value of this evidence, we cannot say that value was substantially outweighed by the prejudicial effect of depicting Crespo as angry and violent. The district court, thus, did not err, let alone plainly err, by admitting this portion of Agent Luna's testimony. *See United States v. Mosquera*, 886 F.3d 1032, 1046 (11th Cir. 2018) ("It was not

plain error—indeed, it was not error at all—for the court to not strike the question *sua sponte*.").

### 5. *There is No Cumulative Error Requiring Reversal*

As demonstrated above, none of Crespo's "individual claims of error or prejudice have any merit." *See Morris*, 677 F.3d at 1132. "Where there is no error . . . , there can be no cumulative error." *Gamory*, 635 F.3d at 497. We thus conclude that Crespo failed to show cumulative error and his convictions are upheld on these grounds. We turn next to address the motion for judgment of acquittal.

### F.    Motion for Judgment of Acquittal

Crespo appeals the district court's denial of his motion for acquittal and argues that there was insufficient evidence to support his conviction. Specifically, Crespo appeals the denial of his motion as to Counts Five, Seven, Eight, and Ten.

In reviewing a challenge to the sufficiency of the evidence and the denial of a Rule 29 motion for judgment of acquittal "'[w]e view the evidence in the light most favorable to the government,' making all reasonable inferences and credibility choices in the government's favor, and then 'determine whether a reasonable jury could have found the defendant guilty beyond a reasonable doubt.'" *Gamory*, 635 F.3d at 497 (quoting *United States v. Mercer*, 541 F.3d 1070, 1074 (11th Cir. 2008)).

Under this standard, a district court's denial of a motion for judgment of acquittal will be upheld "if we 'determine that a reasonable fact-finder could conclude that the evidence established the defendant's guilt beyond a reasonable doubt.'" *Id.* (quoting *United States v. Descent*, 292 F.3d 703, 706 (11th Cir. 2002)). "The evidence need not be inconsistent with every reasonable hypothesis other than guilt, and we allow the jury to choose among several reasonable conclusions to be drawn from the evidence." *Id.* (citing *United States v. Hunt*, 526 F.3d 739, 745 (11th Cir. 2008)). With these principles in mind, we turn now to Crespo's arguments.

### 1. Conspiracy to Commit Witness Tampering (Count Five)

Crespo argues that there was insufficient evidence to show that he knowingly and willfully joined a conspiracy to commit witness tampering.

"For a defendant to be found guilty of conspiracy, the government must prove beyond a reasonable doubt (1) that a conspiracy existed; (2) that the defendant knew of it; and (3) that the defendant, with knowledge, voluntarily joined it." *United States v. Sosa*, 777 F.3d 1279, 1289–90 (11th Cir. 2015). "[B]ecause the crime of conspiracy is predominantly mental in composition, it is frequently necessary to resort to circumstantial evidence to prove its elements." *Id.* at 1290 (quoting *United States v. Toler*, 144 F.3d 1423, 1426 (11th Cir. 1998)).

As an initial matter, Crespo does not dispute that the first and second prongs are met. So, his success on this issue turns on

whether sufficient evidence supports that he voluntarily joined the conspiracy to commit witness tampering.

Crespo argues that the government's failure to prove that he lied to SA Barranco about the patient interviewees having COVID during their July 8 conversation means that insufficient evidence supported his conviction. But Crespo ignores other evidence in the trial record from which the jury could reasonably conclude that Crespo was guilty beyond a reasonable doubt of this Count. For example, a jury could reasonably conclude that Crespo's phone calls with Diaz about providing materially false testimony to SA Lawless was evidence of Crespo voluntarily conspiring to witness tamper. Additionally, the jury could also reasonably conclude that Crespo's voicemail to Lorenzo using Diaz's phone was his voluntary attempt to dissuade Lorenzo from speaking with investigating agents.

### 2. Witness Tampering (Counts Seven and Eight)[9]

We next address whether sufficient evidence supported Crespo's convictions for witness tampering.

"[A] person violates 18 U.S.C. § 1512(b) if he (1) knowingly uses intimidation, threatens, or corruptly persuades another person, or engages in misleading conduct toward another person, with intent to (2) hinder, delay, or prevent the communication of infor-

---

[9] Crespo was convicted of three counts of witness tampering but only appeals the sufficiency of the evidence for these two counts.

mation relating to the commission or possible commission of a federal offense (3) to a law enforcement officer or judge of the United States." *United States v. Gatlin*, 90 F.4th 1050, 1062 (11th Cir. 2024) (citation modified).

Crespo only disputes the first prong for Counts Seven and Eight. Count Seven concerns Crespo's July 8 conversation with SA Barranco about the patient recruits having COVID. For this Count, Crespo argues that the evidence showed only that he told SA Barranco about the patient recruits having COVID because he had legitimate concerns about the safety of the HHS agents. Count Eight concerns Crespo's July 17 conversation with Diaz about what to tell SA Lawless. For this Count, Crespo argues that he told Diaz about what to say to SA Lawless because he was intoxicated.

But once again, Crespo ignores other evidence in the trial record from which the jury could reasonably convict Crespo for these counts. As to Count Seven, the jury could reasonably conclude that Crespo was lying about the patient recruits having COVID because SA Barranco testified about Crespo's unwillingness to identify the source of his information and demeanor during the conversation. As to Count Eight, the jury could reasonably conclude that his call with Diaz about what to tell SA Lawless was made with the requisite knowledge and intent, despite having a few drinks.

### 3. *Conspiracy to Obstruct Justice (Count Ten)*

Last, we address whether sufficient evidence supported Crespo's convictions for conspiracy to obstruct justice.

A person violates 18 U.S.C. § 1512(c)(2) if he corruptly obstructs, influences, or impedes any official proceeding, or attempts to do so. "[T]he government must prove that the defendant knew of or foresaw an official proceeding, and knew that his actions were likely to affect it." *United States v. Beach,* 80 F.4th 1245, 1257 (11th Cir. 2023) (quoting *United States v. Friske*, 640 F.3d 1288, 1292 n.5 (11th Cir. 2011)). An official proceeding can be a grand jury proceeding and need not be pending or instituted at the time of the offense. *See id.* at 1255; 18 U.S.C. § 1512(f); *see also McAndrew v. Lockheed Martin Corp.*, 206 F.3d 1031, 1040 (11th Cir. 2000).

Crespo argues that there was insufficient evidence to support his conviction of Count Ten because trial evidence showed that the investigation into Dr. Gonzalez was closed and Crespo could not have suspected that there would be any other official proceedings. But on review of the trial record, it was also reasonable for the jury to conclude that Crespo foresaw that an official proceeding, Diaz's grand jury indictment, would take place. The evidence revealed that all Strike Force investigations sought to indict the individuals they were investigating and the jury could conclude that Crespo, a Strike Force member, knew this was the case. So, when Crespo learned that Diaz was being investigated, the jury could have also concluded that Crespo could foresee that a grand jury proceeding might take place, even though it was not "pending or about to be instituted at the time of [Crespo's conduct]." *See* 18 U.S.C. § 1512(f).

### G.      Good Faith Jury Instruction

Crespo argues that the district court erred in refusing to give his requested jury instruction on good faith as a defense to his charges in Counts Seven through Ten—witness tampering and obstruction of justice.  Crespo's theory is that instead of acting with intent to obstruct the investigation, Crespo was acting with intent to assist or help Diaz.

We will reverse a district court's decision not to give a requested jury instruction "when we are left with a substantial and ineradicable doubt as to whether the jury was properly guided in its deliberations."  *United States v. Lopez*, 590 F.3d 1238, 1248 (11th Cir. 2009) (quoting *United States v. Grigsby*, 111 F.3d 806, 814 (11th Cir. 1997)).  The requested instruction (1) must be "correct;" (2) must not be "substantially covered by the charge actually given;" and (3) must "deal[] with some point in the trial so important that failure to give the requested instruction seriously impaired the defendant's ability to conduct his defense."  *United States v. Chastain*, 198 F.3d 1338, 1350 (11th Cir. 1999).  We "examine[] the jury charges as a whole, determining whether the entire charge sufficiently instructed the jury about the issues."  *United States v. Horner*, 853 F.3d 1201, 1208 (11th Cir. 2017).

First, Crespo's jury instruction is incorrect because he does not cite to any relevant caselaw, and we are aware of none, indicating that good faith is a defense to witness tampering and obstruction of justice.  *See United States v. Zlatogur*, 271 F.3d 1025, 1030 (11th Cir. 2001) (requiring a jury instruction to have legal support).

Second, Crespo's proposed instruction was substantially covered in the charge actually given because the jury was informed of the necessary state of mind to be convicted when the district court described "knowing" and "willful" conduct, "corrupt persuasion," and "misleading conduct," as relevant to the criminal counts. *See* 18 U.S.C. §§ 1512(b)(3), (c)(2). The district court's instructions were sufficient to guide the jury. *See Horner*, 853 F.3d at 1208. And third, refusing to give the proposed jury instruction did not seriously impair Crespo's ability to conduct his defense because there was no evidentiary basis to give this instruction. *See Zlatogur*, 271 F.3d at 1030 (requiring some basis in the evidence). In observing the above, we cannot say that there is an ineradicable doubt that the jury was misguided in its deliberations. *See Lopez*, 590 F.3d at 1248.

We thus conclude that the district court did not abuse its discretion in rejecting Crespo's proposed jury instruction.

## H.    Sentencing

We now address the final issue raised on appeal. Crespo argues that the district court miscalculated his sentence for two reasons: his base offense level should have been calculated based on his involvement in Diaz's crimes, not Dr. Gonzalez's, and the district court failed to make individualized findings regarding the scope of his involvement in Dr. Gonzalez's crimes.

Under the Sentencing Guidelines, a defendant is held accountable for his relevant conduct. *See* U.S.S.G. § 1B1.3. Application Note 3 of § 1B1.3 provides that, when a defendant is convicted

of a drug conspiracy offense, his relevant conduct includes drug quantities with which the defendant "was directly involved" and also "all quantities of contraband that were involved in transactions carried out by other participants, if those transactions were within the scope of, and in furtherance of, the jointly undertaken criminal activity and were reasonably foreseeable in connection with that criminal activity." U.S.S.G. § 1B1.3, cmt. n.3(D).

Here, Crespo misunderstands the oxycodone quantity used to calculate his sentence. He claims that the district court improperly attributed all of Dr. Gonzalez's illegal distribution to Crespo. But a closer look at the PSI and the district court's adoption thereof show that this is not the case. Specifically, the PSI only included Crespo's portion of Dr. Gonzalez's distribution to Diaz and neither included the remainder of Dr. Gonzalez's oxycodone distribution nor the oxycodone from other clinics that Diaz referred patients to. And Crespo "jointly undert[ook] criminal activity" in furtherance of this portion of the scheme because he impeded the investigation thereof. *Id.*

Crespo's second argument fares no better. In support, he cites to *United States v. Moran*, where we held that "[t]o determine whether a defendant is liable for the acts of co-conspirators, the district court must first make individualized findings concerning the scope of criminal activity undertaken by the defendant." 778 F.3d 942, 974 (11th Cir. 2015). But Crespo cites the wrong standard because his offense "involved obstructing the investigation or prosecution of a criminal offense," for which we apply U.S.S.G. § 2X3.1,

the "Accessory After the Fact" Guideline. *See United States v. McQueen*, 86 F.3d 180, 182 (11th Cir. 1996). According to this guideline, his sentence is "based on the severity of the underlying offense that was the subject of the judicial proceeding sought to be obstructed, impeded or influenced." *See United States v. Brenson*, 104 F.3d 1267, 1285 (11th Cir. 1997); *see also McQueen*, 86 F.3d at 182. Because the purpose of Crespo's obstruction offense was to impede the investigation into Diaz's trafficking, his sentence was based on that underlying drug trafficking offense.

We thus conclude that the district court did not err in calculating Crespo's sentence.

## IV.   CONCLUSION

For all these reasons, we affirm Crespo's convictions and sentence.

**AFFIRMED.**